**MARY Z. LOOKNANAN MAHARAJ, Plaintiff**

v.

**HARRY LOOKNANAN and CANDIDA SANTIAGO, Defendants**

Civil No. 525/1979

Territorial Court of the Virgin Islands

Div. of St. Croix at Christiansted

February 16, 1982

MARK MILLIGAN, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

JOEL HOLT, ESQ., Christiansted, St. Croix, V.I., *for defendant Santiago*

SILVERLIGHT, *Judge*

## MEMORANDUM OPINION

This case, improperly entitled "An action for property settlement," is now before the Court for disposition. No evidence of the fraud alleged in Count One of the counterclaim has been adduced and that Count is accordingly dismissed.

### THE FACTS

An agreement for the sale and purchase of real property covering Plot 64 Estate Diamond, Queens Quarter, St. Croix, was entered into between defendant Santiago and Midland Equity Corporation[1] on August 5, 1968. This contract was recorded in the Office of the Recorder of Deeds, St. Croix. The purchase price was to be $4,100, $300 of which was tendered as a down payment. Subsequently, defendant remitted twelve monthly payments of $75.00 each for a total payment of $1,200.00. She also expended $150.00 for an architect to design the house, $27.00 for approval by the Department of Public Works and $150.00 to clear the land and begin work on a cistern. Payments ceased, she asserts, because Santiago's daughter who was living with defendant Harry Looknanan (hereinafter "Looknanan") was supposed to take over the payments. Closing on the contract never took place.

Mary Looknanan Maharaj (hereinafter "Maharaj") and Harry Looknanan were married in 1967 and one child was born of this marriage. On September 20, 1969, during their marriage, they purchased by Warranty Deed, Plot 64 Estate Diamond, Queens Quarter, St. Croix, from Midland Equity Corporation and Donn B. Schindler. The deed was recorded on October 22, 1969. As part of the down payment, Maharaj advanced $1,068.03 of which $1,000.00 was later returned to her by Looknanan. She paid a $7.50 fee to have the deed

---

[1] Midland Equity has not been made a party to this action.

recorded and she paid taxes on the property for the years 1969 through 1979.

Maharaj and Looknanan were divorced by decree of the District Court of the Virgin Islands in 1970. This suit was instituted by Maharaj in the District Court in 1972 as an "Action for Property Settlement and Reservation of Rights of the Court and Debt" against Looknanan. The Court in rendering judgment on the complaint in that action reserved consideration on the question of property settlement but ordered child support payments to be made by defendant Looknanan. The amended complaint, in that action, which now brings before this Court the issue of property settlement, was filed on August 19, 1979. In addition to the original defendant Harry Looknanan, Candida Santiago was named as co-defendant. The amended complaint alleged that in addition to the money plaintiff paid toward the property and for taxes thereon, defendant owes arrearages for child support of $1,888.00.[2] Defendant Looknanan was served with the amended complaint by certified mail pursuant to an order for substituted service but has not answered the amended pleadings.[3] Defendant Santiago was served and appeared and answered by and through her counsel. Trial was held on January 17, 1981, at which time, plaintiff, defendant Santiago and a representative of the Territorial Court Cashier's Staff in charge of child support payments testified.

## THE ISSUES

The broad question presented to this Court is what effect does the prior recorded contract of defendant Santiago have on plaintiff's title to the property. The specific issues that the court will address are:

(1) Does defendant Looknanan owe plaintiff an arrearage of child support.

(2) If the arrearage exists, does it constitute a lien in favor of Maharaj against Looknanan's interest, if any, in the property in question.

(3) Did the contract entered into by defendant Santiago constitute a lien against Plot 64 Estate Diamond for the purchase price paid.

---

[2] This figure was modified at trial to $1,545.00.

[3] Looknanan had filed a pro se answer to the original complaint in or about January 1973, which was followed by the filing of a notice of appearance of counsel on his behalf on or about January 18, 1973. Successful service of the Amended Complaint is established by both the Certified Mail Return Receipt on file and Looknanan's letter to the Court dated October 1, 1979, also on file.

(4) If a lien existed, was there a breach of the sales contract either, by

(a) the buyer entering the property prior to the closing in order to build a cistern, or

(b) because the buyer was in default of the contract.

(5) If there was a breach, what effect does it have on the lien.

(6) If there was a breach, what rights did the seller, Midland Equity, retain or regain in the property.

## DISCUSSION

### A. Arrearages

The question of arrearages was addressed at trial. Iris Bastian, a representative of the Territorial Court Accounting Department, testified that the amount owing to plaintiff, pursuant to prior court order was $1,545.00. A copy of the payment record was introduced at trial and admitted as Plaintiff's Exhibit #4. This record was undisputed and the Court, therefore, fixes the arrearage at $1,545.00.

Having established that an arrearage does exist the question of enforcement of this sum is next for resolution.[4] Title 16, Chapter 13 of the Virgin Islands Code defines the rights, duties and obligations of support of relations. Section 423 of Title 16 recites that "[i]f the court of the responding state finds a duty of support, it may order the defendant to furnish support or reimbursement therefore and *subject the property of the defendant to such order.*" (Emphasis added.)[5] See Lorillard v. Lorillard, 5 V.I. 483, 490–91, 358 F.2d 172,

---

[4] Although neither side raised the issue, the Court feels compelled to speak to the question of jurisdiction. None of the constitutional infirmities which existed in certain cases recently before the United States Supreme Court are present here. Rush v. Savchuck, 100 S.Ct. 571 (1980) and Shaffer v. Heitner, 433 U.S. 186 (1977) require an examination of a state court's exercise of jurisdiction over an absent defendant "according to the standards set forth in International Shoe and its progeny." Shaffer at 204. The inquiry must focus on "the relationship among the defendant, the forum, and the litigation." Shaffer at 204. Harry Looknanan lived in this jurisdiction and participated actively in the procurement of the land which forms the basis of this suit. He fathered a child here for whose support the arrearage is now sought. He was served with notice of this action and declined to answer and defend. The exercise of jurisdiction, in personam and in rem is free from constitutional prohibition.

[5] The provisions of this chapter are popularly known as the Uniform Reciprocal Enforcement of Support Act. Although this case was not brought under a URESA petition, the Act is instructive as to the underlying legislative policy and intent applicable to support of children. The Looknanans were granted a divorce by the District Court in 1970. This Court, as the successor to the District Court for the handling of matrimonial actions, retains continuing jurisdiction for the

138

176 (3d Cir. 1966) (court empowered to enforce duty of support validly imposed on defendant by judgment, decree or order). It is recognized that child support payments fixed by a decree become final adjustments on the date they are due, and may be enforced as any other judgment. Binns v. Maddox, 327 So.2d 726, 727 (Ala. Civ. App. 1972); Strecker v. Wilkinson, 552 P.2d 979, 983 (Kan. 1976); Smith v. Bramhall, 556 S.W.2d 112, 113 (Tex. Civ. App.—Waco 1977) (judgment for child support arrearages may be taken against executor of deceased parent's estate). The Appellate Division of the New Jersey Superior Court in Welser v. Welser, 149 A.2d 814, 817–19 (N.J. Super. Ct. App. Div. 1959) discussed the basis for allowing a judgment unpaid for child support to be imposed as a lien on the property of the defendant. The court concluded that "[i]t is clear, therefore, that a writ of execution is available to enforce a judgment in a matrimonial case determining the amount of arrearages due . . . ." Id. at 818.[6]

■ This Court has ascertained that a sum certain for arrearage exists. The satisfaction of that amount may be enforced in a manner consistent with the enforcement of judgments. The imposition of a lien on whatever interest Harry Looknanan may have in Plot 64 Estate Diamond would be in keeping with the intent of 16 V.I.C. § 423. Cf. Sonneman v. Tuszynski, 191 So. 18 (Fla. 1939) (equitable lien charged against defendant's property where parties have agreed that defendant would support plaintiff during her lifetime).[7]

## B. Defendant Santiago's Claim of Title

The Court must next consider what interest, if any, Candida Santiago has in the realty. The factual setting surrounding her acquisition of such interest is not disputed. What is contested is reten-

---

purpose of child support. See Cox v. Cox, 8 V.I. 543, 555, 457 F.2d 1190, 1194 (3d Cir. 1972).

[6] The historical differences between equity and law and the procedural prerequisites upon which the New Jersey court elaborated are of little significance to our consideration. The thrust of the opinion, allowing a judgment for child support arrearages to become a lien on the defendant's property is, however, material to our determination.

[7] The Court is not unmindful of the New York cases of Geary v. Geary, 6 N.E.2d 67 (N.Y. 1936) and Caplan v. Caplan, 287 N.E.2d 385 (N.Y. 1972). Those cases do not indicate a contrary result. New York law requires seizure of a nonresident defendant's property prior to the commencement of the lawsuit. This proscription was not followed in either of those cases, thereby mandating a reversal of the lower court's imposition of the lien by the Court of Appeals. Such a requirement does not exist in the Virgin Islands.

tion of it in light of her actions subsequent to the initial steps she took to purchase the land.

Mrs. Santiago asserts that an equitable lien has arisen in her favor against Plot 64 Estate Diamond by virtue of tender to the seller of a down payment and twelve monthly installments, as well as other monies expended. Plaintiff Maharaj contends that despite these facts Santiago has lost any right to an equitable lien on the property because the contract of sale was breached both by violation of a covenant of the agreement and by default in making the payments.

"An equitable lien is merely a charge or encumbrance imposed on specifically described property by a court of equity; it is not required that the property be in the possession of the person in whose favor the lien is declared." H. McLINTOCK, HANDBOOK OF PRINCIPLES OF EQUITY § 118 (2d ed. 1948). "A purchaser who has made payments is given a lien on the land to secure their return." Id. § 120 at 323. The facts in the instant case give rise to a prima facie finding of an equitable lien. There was a contract for the sale of land entered into between vendor and defendant Santiago as vendee. Payments were made in accordance with the terms of that contract. The land was not sold to the original vendee but to a third party, and the defendant never received reimbursement of the money tendered.[8]

Having found the existence of a lien it must be ascertained if any of defendant Santiago's actions constituted a breach of the contract.

The agreement of August 5, 1968, admitted in evidence as Defendant's Exhibit A recites, as covenant 3 *"Date of Possession. Buyer shall not be entitled to enter and take possession of the plot hereinafter described until closing."* Prior to the closing, Santiago, through her agents, entered the property, cleared the land and began construction of the cistern. Plaintiff argues that this act of dominion on the land constituted actual possession sufficient to vitiate the agreement. Santiago urges that the acts complained of are only improvements and do not, standing alone, give rise to any type of possession. Furthermore, she says, even if possession can be found the repairs represent a benefit to the owner.

---

[8] The lien arises by virtue of the contract for sale. The lien would not be valid against a bona fide purchaser for value without notice. See Callwood v. Callwood, 3 V.I. 287, 291, 158 F.Supp. 54 (D.V.I. 1958). In this case the contract was recorded and the subsequent purchasers took with knowledge of the existence of a prior right. See Hamilton v. Luca, 209 A.2d 360, 364 (Super. Ct. Law Div. N.J. 1965).

[6–8] The general rule is that:

> if there is no agreement, expressed or implied, in a contract for the sale of real estate, the purchaser is not entitled to possession until the full payment of the purchase price has been made, and if the purchaser complies with his part of the contract and pays the purchase price as agreed and receives the deed to the premises, he is then, and not until then, entitled to possession of the property sold.

Nyquist v. Bauscher, 227 P.2d 83, 86 (Idaho 1951). A contract, such as that under consideration here, "is prospective in its operation and does not, without special stipulation, confer rights of immediate occupancy in the vendee." Rapine v. Harvey, 16 A.2d 822, 823 (N.J. Ch. 1940). In Duff v. United States Trust Co., 97 N.E.2d 189, 192 (Mass. 1951) the court held that where the purchaser of plots of land had no deeds, but only contracts to buy completed houses, the vendees had no right to take possession of the houses. Id. at 192. See Douglas v. Thompson, 88 N.E.2d 744 (Ill. App. Ct. 1949) (Mem. Op.). That possession was prohibited before the closing date here is sufficient to support the finding that the action of the defendant constituted a breach of the third covenant of the contract. If the facts of this case are measured by the analogous situation of what improvements constitute dominion for the purposes of adverse possession, the test can be met. "The sufficiency of particular improvements to manifest possession depends on the circumstances of each case and must necessarily vary according to the characteristics of the land, its location and the uses to which it is usually put." 2 C.J.S. Adverse Possession § 37, p. 697. Here Santiago had the land cleared and work started on the cistern. Plans in preparation for the building of a house were begun. These acts were in contravention to an express covenant embodied in the contract. They constitute breach.

The failure to make payments is also a renunciation of the agreement. "Abandonment by the purchaser is shown . . . where [s]he positively and absolutely refuses to perform the conditions of the contract, such as failure to make payments due, accompanied by other circumstances, . . . or where by [her] conduct [she] clearly shows an intention to abandon the contract." Nelson v. Hacker, 270 N.W. 720, 721 (Mich. 1936). Defendant contends there was no interruption in the installment payments. Yet, by her testimony she admits making only a down payment and twelve monthly payments amounting to $1,200.00 against the purchase price of $4,100.00. The cessation of the monthly installments, for whatever reason, in a

141

"time is of the essence" contract is an abandonment of the agreement giving rise to a breach.

Defendant alleges that if the acts complained of by the seller are breaches, any attempt to enforce them is void because covenant 6 of the agreement states that "such default shall continue for a period of sixty (60) days *after notice and demand.*" (Emphasis added.) Since no notice was given in 1968, defendant concludes that the default cannot now be asserted.

Rescission or forfeiture of a contract for the sale of land usually requires notice to the breaching party of the seller's intent. United States v. 969.46 Acres of Land, 386 F.Supp. 793, 798 (M.D.N.C. 1974), aff'd, 535 F.2d 1251 (4th Cir. 1976). Some courts have held, however, that where the contract contains a "time is of the essence" clause it is not necessary for the vendor, in order to assert a default to give notice to the vendee after a breach. Herrera y Nogueira v. Helker, 139 So.2d 895, 896 (Fla. Dist. Ct. App. 1962); Conner v. Fisher, 202 N.E.2d 572, 576 (Ind. App. Ct. 1964); Knable v. Bradley, 242 A.2d 224, 226–27 (Pa. 1968).

These cases do not satisfy the inquiry as none speak to what effect a covenant to give notice would have on a contract containing a "time is of the essence" clause. Tovrea v. Alderman, 330 F.2d 512, 514 (9th Cir. 1964) held that "if notice of intent was required before forfeiture, the abandonment [of the contract] waived the notice of forfeiture." Id. at 514. The facts in Tovrea are distinguishable from the case at bar in that the conduct of the parties there showed a clear intention to abandon the contract. Santiago's abandonment, by failure to make payments, while not as readily discernable, must be viewed in the overall context of the factual situation. In the contract between Midland Equity and Santiago time was made of the essence.[9] In Tovrea it was not. Given the lapse of time between the actual default and the assertion here of any rights, a finding of an abandonment is not unwarranted. Notice, therefore, was not required. Santiago, additionally, admits actual knowledge of the transfer of title to the land, albeit erroneously believing that the transfer was to her daughter. In making a determination as to what constitutes abandonment, a reasonable time under the circumstances will be inferred. Cf., Montana Williams Double Diamond v. Royal Village, Inc., 607 P.2d 1120, 1123 (Mont. 1980) (option to assert waiver must be exercised promptly but waiver does not com-

---

[9] Paragraph 6, Contract of Purchase and Sale, Defendant Exhibit A.

pel that the contract be kept open indefinitely).[10] The Court is supported in its finding of no notice requirement, as the party against whom the waiver should be asserted is Midland Equity, and not plaintiff Looknanan. Defendant aptly points out "many subsequent purchasers generally require that the breach be established and the contract voided by declaratory judgment action, but this procedure is not mandated by Virgin Islands law." Defendant Santiago's Post Trial Memorandum at 4–5.

In light of the foregoing, the Court is called upon, in an exercise of its equity jurisdiction, to determine the effect the breach has on the lien. Santiago has correctly noted that the "cases are not in agreement as to whether a vendee's default under the contract of sale precludes him from asserting a vendee's lien as against a subsequent purchaser from, or creditor of, the vendor." Annot., 82 A.L.R.3d 1040, 1052 (1978). A number of courts have held that a purchaser who abandons a contract or refuses to perform according to its terms is not entitled to a lien to secure the money tendered. Tuttle v. Ehrehart, 137 So. 245 (Fla 1931); see also Annot., 33 A.L.R.2d 1384, 1393 (1954) (cases cited therein).

A few courts have reached a contrary conclusion. In Lowe v. Maynard, 115 S.W. 214, 215 (Ky. 1909), the plaintiffs "failed to comply with the contract by tendering the real balance due within the time specified." The court concluded "[u]nder the circumstances, then, it would be inequitable to permit the defendants to retain the cash consideration paid for the land." Id. at 215. The court imposed a lien for $200.00, plus interest from the date paid, which sum represented the down payment.

In Hawkins v. Mullen, 223 N.W. 670, 672 (Neb. 1929) the court found that "appellant was entitled to return of the purchase money paid, upon the rescission of the contract by the appellee. It would be inequitable and unreasonable to permit the appellee to retain the property and fruits of his occupation thereof, and also the money paid." Id. at 672. See Billups v. Gallant, 37 S.W.2d 770, 773 (Tex. Civ. App.—Austin 1931).

 Although Santiago's mistaken belief in stopping the payments was not sufficient justification to alter a finding of breach of contract, such circumstances are pertinent in determining what effect a default should have. Here the defendant entered the land

---

[10] The question of waiver of strict compliance was not raised by the parties. The Court will not, therefore, rule on the effect the reduced monthly payments would have on the issue of waiver of strict compliance with the terms of the contract.

and made improvements on the property. She ceased making payments only because she believed that her daughter, who was allegedly living with Looknanan, would start making them. Looknanan was one of the two subsequent purchasers of the land after Mrs. Santiago's default. To decline to order the return of the purchase money under these circumstances would be unjust. Accordingly, the Court finds $1,527.00 owing to Santiago. A lien for that amount will be entered against Plot 64 Estate Diamond.

### C. Midland's Interest

Midland Equity is not now, and has never been, a party to this action. Although certain rights, duties and obligations may be forthcoming to, or owed by, Midland the Court will not address those rights since the matter was not presented for disposition.

### CONCLUSION

In summary the Court concludes:

First, that Looknanan owes to Maharaj the sum of $1,545.00 for child support arrearages, and a lien for this amount exists against his interest in Plot 64 Estate Diamond.

Second, that an equitable lien for purchase money and improvements exists in favor of Santiago and against Plot 64 Estate Diamond. The lien arises in spite of defendant's default on the original contract of sale, but is second in priority to the lien in favor of Maharaj;

Third, that in order to satisfy both liens the property shall be sold at marshal's sale to the highest bidder;

Fourth, in the event that such sale results in an excess after satisfaction of the foregoing liens, such excess shall be remitted to the record title owners of said Plot 64 as their interests may appear; and

Finally, each party will bear their own costs and attorney's fees.